IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FODAY KANU                        :            CIVIL ACTION
                                  :
          v.                      :
                                  :
KEVIN KAUFFMAN, et al.            :            NO. 19-3278

MEMORANDUM

Bartle, J.                                    July  28, 2020

          Before the court is the motion of Foday Kanu ("Kanu"),
a prisoner at the State Correctional Institution in Huntingdon,
Pennsylvania, to vacate, set aside, or correct his sentence
under 28 U.S.C. § 2254.

          On October 16, 2009, after a trial in the Court of
Common Pleas of Chester County, a jury convicted Kanu of rape,
sexual assault, false imprisonment, aggravated assault, and
witness intimidation.  On March 11, 2020, he was sentenced to a
term of imprisonment of sixteen to thirty-two years.  His appeal
was denied.  In 2014, Kanu filed in the Court of Common Pleas a
petition under the Pennsylvania Post Conviction Relief Act
("PCRA"), 42 Pa. Cons. Stat. § 9501 et seq.  After an
evidentiary hearing, the court granted Kanu a new trial on the
ground that his counsel was ineffective for failing to call
several fact and character witnesses on his behalf.  On June 6,
2018, the Pennsylvania Superior Court reversed the Court of
Common Plea's grant of a new trial and denied relief on all of

Kanu's claims.  On February 27, 2019, the Pennsylvania Supreme
Court denied review.

On July 26, 2019, Kanu timely filed in this court his
motion to vacate, set aside, or correct his sentence under 28
U.S.C. § 2254.  The petition was referred to United States
Magistrate Judge Timothy R. Rice who issued a Report and
Recommendation that Kanu's claims be dismissed with prejudice as
procedurally defaulted and as without merit.  Kanu has filed
objections to the Report and Recommendation which are now before
the court pursuant to 28 U.S.C. § 636(b)(1)(C).

I

The Antiterrorism and Effective Death Penalty Act of
1996 ("AEDPA") governs the power of the federal courts to grant
habeas corpus relief to state prisoners such as Kanu.  See 28
U.S.C. § 2254.  Under § 2254(a), a federal court may entertain a
habeas corpus petition from "a person in custody pursuant to the
judgment of a State court only on the ground that he is in
custody in violation of the Constitution or laws or treaties of
the United States."  28 U.S.C. § 2254(a).  A federal court may
not grant relief unless the state prisoner has exhausted all
available remedies in state courts.  Id. § 2254(b)(1)(A);
Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1998).

When a federal court reviews a state court's
determination of federal law, the state court's decision must

-2-

stand unless it, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Thomas v. Carroll, 581 F.3d 118, 124 (3d Cir. 2009) (quoting 28 U.S.C. § 2254(d)). A state court decision is contrary to clearly established federal law if: (1) its conclusion is "opposite to that reached by [the Supreme] Court on a question of law"; or (2) it "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court can unreasonably apply Supreme Court precedent in two ways: (1) "if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case"; or (2) "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

A federal court also may grant a motion under § 2254 if the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d)(2).  Factual determinations made by the state court are accorded a presumption of correctness:  "a federal court must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary."  Stevens v. Del. Corr. Ctr., 295 F.3d 361, 368 (3d Cir. 2002) (citing 28 U.S.C. § 2254(e)(1)).  To prevail under this "unreasonable determination" prong, therefore, petitioner must demonstrate by clear and convincing evidence that the state court's determination of the facts was objectively unreasonable in light of the evidence available. See Lambert, 387 F.3d at 235.  Mere disagreement with the state court or a showing of erroneous factfinding by the state court will be insufficient to warrant relief, provided that the state court acted reasonably.  See id.

II

    The underlying facts of this case, as established at trial and viewed in the light most favorable to the Commonwealth, are as follows.  Kanu, an immigrant from Sierra Leone, met the victim Hawa Koroma ("Koroma"), also an immigrant from Sierra Leone, while working at an assisted living community.  Koroma was a nursing assistant and was also taking classes to obtain a Licensed Practical Nurse ("LPN") degree.

Koroma and Kanu became friends in what Koroma described as a brother-sister relationship. Koroma provided Kanu with a key to her apartment and Kanu would often come to Koroma's apartment to eat. Kanu borrowed money from Koroma on two occasions and subsequently paid it back. In late September 2006, Koroma again lent Kanu money to purchase a car but on this occasion was not paid back. On or about October 9, 2006, the two had an argument about the borrowed money after which Kanu physically assaulted and then raped Koroma. The next morning Koroma was treated at a hospital but declined to go to the police about the incident. Thereafter Kanu threatened Koroma that "something bad" would happen to her if she reported the rape.

In March 2007, Koroma visited Sierra Leone to attend her father's funeral. After her return to West Chester, Kanu came to her apartment two to three times per week during which time he would rape her and take her credit card to make purchases. Koroma explained that during this time, she was married to another man in Sierra Leone and did not wish to have a sexual relationship with Kanu but acquiesced out of fear.

In March 2008, Koroma decided to come forward to file a complaint regarding the October 2006 rape with West Chester Police Detective Stanley Billie ("Billie"). Koroma also sought a Protection from Abuse ("PFA") order against Kanu. However, in

April 2008 Koroma withdrew the complaint and declined to pursue a permanent PFA order after being threatened by Kanu and his half-brother, Amara Conteh ("Conteh").

On July 21, 2008, Kanu called Koroma and stated he was coming to her apartment to repay the money he owed her.  Kanu entered the apartment around 2:00 p.m. but did not have the money.  The two had an argument and Koroma then left to attend a night class.

Koroma returned to the apartment around 11:00 p.m. She showered, changed, and prepared for dinner an African dish similar to oatmeal.  At some point, Koroma turned around and encountered Kanu in the apartment.  She was not sure how he had gained entry.  Kanu gagged Koroma, pushed her down on her bed, and restrained and forcibly raped her.  Koroma at first struggled but later gave up resistance after seeing Kanu had a knife.  Kanu ejaculated into a white t-shirt.  He then forced Koroma to shower.

Afterwards, Koroma confronted Kanu in her living room and threatened to report him to the police.  At the time, Koroma was holding in her hands the hot pot containing her dinner. Kanu pushed her and the pot flew, its contents burning both of them.  Kanu pushed Koroma to the floor, hit her, and pushed pillows into her mouth.  Koroma lost consciousness.

An unidentified individual then called 911.  When
police arrived at the apartment, Koroma was hysterical and
unresponsive to questions.  Kanu was present at the apartment
along with several unidentified individuals who all appeared
calm and somewhat disinterested.  Police took Koroma to Chester
County Hospital and then Brandywine Hospital where a nurse took
saliva, hair, nail scrapings, and other evidence as part of an
investigation known as a "rape kit."  Koroma gave a statement to
Detective Billie later that day and also provided to authorities
the t-shirt containing Kanu's sperm.  When Detective Billie
called Kanu to ask if he would be willing to speak about the
incident, Kanu became irate and yelled "I am her boyfriend, I
can do what I want."  Koroma was later transported to Crozer
Hospital, where she was treated for three days for her burns.

On August 1, 2008, Kanu was arrested pursuant to a
warrant for the July 21, 2008 rape.  Koroma then began to
receive calls from Kanu's family in Africa who attempted to
convince her not to pursue the charges.  She also received calls
from her own family in Africa who was concerned that her life
would be endangered if she proceeded with the complaint.  A
village elder flew from Africa to meet with Koroma and the
Assistant District Attorney in an attempt to persuade Koroma to
drop the charges and to marry Kanu.  As a result of this
pressure campaign, Koroma failed to appear for the preliminary

hearing on August 19, 2008 and the charges were dropped.  Koroma explained that at that time she was seeking treatment at a crisis intervention center and had been contemplating suicide.

After receiving counseling, medical treatment, and religious support, Koroma reinstated her complaint against Kanu on January 21, 2009.  Shortly thereafter, she was called by a family friend to a "family meeting" in West Philadelphia.  When Koroma arrived at the meeting, she discovered Kanu there. Ibrahim Jalloh ("Jalloh"), a friend of Kanu, gave Koroma a check for $3,000 as a partial payment on the debt owed by Kanu to Koroma.  Kanu apologized to Koroma for the July 21, 2008 rape and proposed marriage.  Koroma refused.  After this meeting, Kanu and his friends and family continued to contact Koroma and to insist that the two get married.  They also threatened to harm Koroma if she persisted with the charges against Kanu.

At trial, Kanu took the position that he and Koroma had a consensual sexual relationship.  Kanu posited that Koroma had falsely accused him of rape because he had refused to marry her or because Koroma was angry about the money he owed her. Conteh, Kanu's half-brother, testified that he had known Koroma as Kanu's girlfriend and that Koroma had voluntarily lived with Conteh, Kanu, and others from approximately March 2008 until April 2008.  He also produced a picture of Koroma with Kanu's parents taken at the parents' house in Sierra Leone in March

-8-

2007, when Koroma had travelled to Sierra Leone for her father's funeral.

At trial, Koroma explained that there is no concept of rape as a crime in Sierra Leone.  A man can have intercourse with whomever he chooses.  If the woman is single, she will then be forced to marry her rapist.  If the woman is married, the rapist will pay a sum of money to the woman's parents.  While men can take multiple wives, women can have only one husband. Marriages are arranged by parents and men pay dowries in exchange for their brides.  Conflicts are resolved by the families of the parties involved and by the village elders. Although it is rare for women to receive a formal education, Koroma attended a school run by missionaries while living in her village and later in Freetown, the capitol of Sierra Leone.  She subsequently won a visa to come and work in the United States.

III

Kanu contends in his objections to the Report and Recommendation of the Magistrate Judge that:  (1)  trial counsel was ineffective for failing to object to propensity evidence admitted at trial in the form of background information regarding the culture of Sierra Leone and for failing to request a jury instruction limiting the use of such evidence; (2) trial counsel was ineffective for failing to object to the prosecutor's improper arguments in her opening and closing that

-9-

vouched for Koroma; and (3) trial counsel was ineffective for failing to call certain character and fact witnesses.

                                    IV

        We begin with Kanu's claim that trial counsel was ineffective for failing to object to evidence and argument about the culture of Sierra Leone.  He maintains that he was unfairly prejudiced by this irrelevant and inadmissible propensity evidence.  As noted above, Koroma testified at trial that she came from a small village in Sierra Leone where women receive little formal education and are treated as chattel.  Marriages are generally arranged by parents and village elders.  While men can marry multiple women, women may only marry one man.  Koroma testified that there is no word for rape in her native language. If a woman who is not already married is raped, the woman is generally forced to marry her rapist.  If a married woman is raped, the rapist is generally required to pay the victim's family.

        Kanu did not raise this claim in the state courts. Before a federal court may consider a state prisoner's habeas claim, the prisoner must first exhaust his remedies in state court.  28 U.S.C. § 2254(b)(1).  To exhaust a claim, the state prisoner must demonstrate that each of his claims was "fairly present[ed]" to the state court before bringing it in federal court.  <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004).  To "fairly

                                   -10-

present" a claim, a petitioner must present its "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999); see also Nara v. Frank, 488 F.3d 187, 197-98 (3d Cir. 2007).

Kanu recognizes that his claim is procedurally defaulted because it was never presented to the Pennsylvania courts. However, he asserts that the procedural default is excused under the Supreme Court's decision in Martinez v. Ryan, 566 U.S. 1 (2012). In Martinez, the Supreme Court recognized a "narrow exception" to the procedural default rule for "[i]nadequate assistance of counsel at initial-review collateral proceedings." 566 U.S. at 9. Under this exception, where state law requires a prisoner to raise claims of ineffective assistance of trial counsel in a collateral proceeding, rather than on direct review, a procedural default on those claims will not bar their review by a federal court if three conditions are met: (1) the default was caused by the ineffective assistance of post-conviction counsel or the absence of counsel; (2) such default occurred in the initial-review collateral proceeding, that is, the first collateral proceeding in which the claim could be heard; and (3) the underlying claim of trial counsel ineffectiveness is "substantial." Preston v. Superintendent

Graterford SCI, 902 F.3d 365, 376 (3d Cir. 2018) (quoting Cox v. Horn, 757 F.3d 113, 124 (3d Cir. 2014)).

A claim for ineffective assistance of counsel is governed by Strickland v. Washington, 466 U.S. 668 (1984).  In Strickland, the United States Supreme Court established the following two-pronged test for ineffectiveness:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

Because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," a court must be "highly deferential" to counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.  "Thus . . . a defendant must overcome the 'presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at

-12-

689).  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u>, 466 U.S. at 694.

As stated above, Kanu objects that Koroma's testimony regarding the treatment of women in Sierra Leone and attitudes towards rape there constituted inadmissible propensity evidence under Rule 404(b) of the Pennsylvania Rules of Evidence.  That Rule provides:

> (b) Crimes, Wrongs or Other Acts.
>
> (1) <u>Prohibited Uses</u>.  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) <u>Permitted Uses</u>.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa. R. Evid. 404(b).  Kanu asserts that his counsel was ineffective for failing to object to this cultural evidence and for failing to seek a jury instruction limiting the use of this evidence.

-13-

Koroma's testimony regarding common attitudes and practices surrounding rape in Sierra Leone was highly relevant to explain why she had failed to pursue charges against Kanu before the July 2008 rape and why she initially failed to proceed with the complaint against Kanu.  See Pa. R. Evid. 401. Under Pennsylvania law, a jury may consider evidence of a lack of prompt complaint in cases involving sexual offenses:

> Prompt reporting to public authority is not required in a prosecution under this chapter:  Provided, however, That nothing in this section shall be construed to prohibit a defendant from introducing evidence of the complainant's failure to promptly report the crime if such evidence would be admissible pursuant to the rules of evidence.

18 Pa. Cons. Stat. Ann. § 3105.  The Pennsylvania Supreme Court has affirmed trial courts' admission of evidence of a defendant's other crimes, wrongs, or acts under Rule 404(b) because "[r]evealing the circumstances surrounding an incident of sexual abuse, and the reasons for the delay, enables the factfinder to more accurately assess the victim's credibility." Commonwealth v. Dillon, 925 A.2d 131, 139 (Pa. 2007).

The probative value of Koroma's testimony about the culture of Sierra Leone clearly outweighed any unfair prejudice. See Pa. R. Evid. 403.  It explained why she had not come forward sooner to report Kanu's sexual abuse.  Absent this evidence, the jury may well have believed that Koroma and Kanu were involved

in a consensual sexual relationship and that she was simply a
jilted lover or was motivated to bring false charges against
Kanu because of the money he owed her.  Counsel was not
ineffective for failing to object to the admission of Koroma's
testimony because any objection would have been meritless.

        We further note that Kanu's counsel filed a pretrial
motion in limine to preclude the Commonwealth from introducing
an expert on the treatment of women in Sierra Leone.  The court
precluded the expert testimony "except as rebuttal testimony if
the Defendant challenges the victim's testimony concerning the
cultural aspects of Sierra Leone in cases of rape as untrue
and/or unbelievable."  It further ruled that its order should
not be construed to preclude Kanu from contesting Koroma's
"credibility as to the alleged rape or [Kanu's] other alleged
bad conduct relative to her, and whether the cultural aspects of
Sierra Leone society in cases of rape were the reason [Koroma]
delayed in promptly reporting the rape and such alleged bad
conduct."  Thus, counsel successfully avoided the introduction
of additional evidence regarding the culture of Sierra Leone in
the form of expert testimony on the ground that it could be used
"to paint defendant in a bad light because of the country of his
birth."  However, it was clear from the court's order that
Koroma herself would be permitted to testify regarding the

-15-

culture of Sierra Leone to explain her delay in reporting and thus any further objection at trial would have been fruitless.

Although it may have been preferable for Kanu's counsel to seek an instruction limiting the jury's use of this evidence, the Magistrate Judge correctly found that such an instruction may have inadvertently called attention to the evidence.  See Buehl v. Vaughn, 166 F.3d 163, 170 (3d Cir. 1999).  Koroma's testimony concerned the culture of Sierra Leone in general, not prior crimes, wrongs, or other acts by Kanu himself.  Moreover, Kanu has not shown that he was prejudiced by this failure given the substantial evidence against him, including the other testimony of Koroma, the burns on Koroma, the t-shirt with Kanu's semen on it, and his statement to law enforcement that he was her boyfriend and "can do what [he] want[s]."

Given this record, we conclude that Kanu has failed to show ineffective assistance based on counsel's failure to object or to seek a limiting instruction, much less a "substantial" claim of ineffective assistance as would be required to overcome his procedural default.  See Preston, 902 F.3d at 376. Accordingly, the motion of Kanu under § 2254 will be denied as to this claim.

V

As stated above, Kanu also asserts that his trial
counsel was ineffective for failing to object to vouching by the
prosecutor.  In her opening and closing statements at trial, the
prosecutor discussed her grandparents, Holocaust survivors who
emigrated to the United States.  She further stated that her
grandparents had instilled in her the need to speak up for
people who "don't have a voice."  The prosecutor then likened
Koroma to her grandparents in that Koroma had also survived a
brutal civil war in Sierra Leone and had come to the United
States to pursue the "American Dream."  The prosecutor also
described a pretrial meeting with Koroma, during which Koroma
appeared terrified and crouched under a table.

Vouching is "an assurance by the prosecuting attorney
of the credibility of a Government witness through personal
knowledge or by other information outside of the testimony
before the jury."  United States v. Walker, 155 F.3d 180, 184
(3d Cir. 1998).  As explained by our Supreme Court in United
States v. Young:

> [S]uch comments can convey the impression
> that evidence not presented to the jury, but
> known to the prosecutor, supports the
> charges against the defendant and can thus
> jeopardize the defendant's right to be tried
> solely on the basis of the evidence
> presented to the jury; and the prosecutor's
> opinion carries with it the imprimatur of
> the Government and may induce the jury to

-17-

> trust the Government's judgment rather than
> its own view of the evidence.

470 U.S. 1, 18-19 (1985).  Prosecutorial vouching is not automatic grounds for reversal of a conviction.  See United States v. Robinson, 485 U.S. 25, 33 n.5 (1988).  Instead, the determination of whether there has been improper vouching and if so, whether there should be a reversal must be determined on a case by case basis.  Hartey v. Vaughn, 186 F.3d 367, 371-72 (3d Cir. 1999).

Kanu failed to raise his claim regarding prosecutorial vouching before the Pennsylvania courts.  We agree with the Magistrate Judge's finding that this claim was procedurally defaulted.  Even assuming the claim is properly before this court, we conclude that it would fail because Kanu has not met the standard for ineffective assistance of counsel claims as set forth in Strickland.

Evidence about Koroma surviving a war in Sierra Leone and coming to the United States was properly admitted through the testimony of Koroma herself.  Similarly, evidence regarding Koroma's fear when coming forward with the charges against Kanu was admitted through Koroma's own testimony as well as that of Detective Billie.  Thus, the statements made by the prosecutor referring to this evidence did not constitute vouching.

The prosecutor's statements about her grandparents were certainly improper.  They had no relevance to the charges against Kanu and served only to bolster Koroma as a sympathetic and credible victim.  Although Kanu's trial counsel failed to object to these statements, the court instructed the jury that comments of counsel are not evidence and that it would ultimately be up to the jury to determine the facts of the case based on evidence presented through witnesses.  As stated above, substantial evidence to convict Kanu existed in the form of Koroma's testimony as well as the presence of Kanu's semen on the t-shirt produced by Koroma, the burns on Koroma's face, hands, and arms, and Kanu's statement:  "I am her boyfriend, I can do what I want."  Based on this record it is evident that the failure of counsel to object to prosecutorial vouching did not prejudice Kanu.  In this court's view, there is not "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Accordingly, the motion of Kanu to vacate, set aside, or correct his sentence under § 2254 based on his counsel's failure to object to prosecutorial vouching will be denied as procedurally defaulted and without merit.

VI

        We turn now to Kanu's claim that his counsel was
ineffective for failing to call certain fact and character
witnesses.  As noted above, trial counsel called Conteh, Kanu's
half-brother, who testified as a fact witness that Kanu and
Koroma were involved in a romantic relationship.  Trial counsel
also introduced by stipulation the statement of Kanu's friend
Jalloh, who if called would have testified that Kanu had a
reputation for being a peaceful and law-abiding person.
According to Kanu, his trial counsel was ineffective for failing
to call at trial Mohammed Koroma and Magnus Stevens ("Stevens")
as fact and character witnesses, and Alie Kargbo ("Kargbo") as a
fact witness.  All three are friends of Kanu.

        Mohammed Koroma would have testified that the victim
and Kanu were involved in a romantic relationship prior to the
alleged rape.  Mohammed Koroma lived with the victim for a
four-month period, during which time Kanu held a key to the
apartment and would come and go and even sleep in the victim's
bed.  As a character witness, he would have testified that he
had known Kanu since he came to the United States in 2000 and
that Kanu had a reputation for peacefulness and for being
law-abiding.  Stevens came to the victim's apartment shortly
after the alleged rape.  He observed that Koroma was conscious
when he arrived and stated that she "put herself on the floor"

shortly before police came to the apartment.  Stevens also would
have testified as to Kanu's good character over the three
decades he has known him, both in the United States and in
Sierra Leone.  Kargbo would have provided testimony regarding
the romantic relationship between Koroma and Kanu.

Kanu's claim is subject to the standard enunciated in
Strickland, that is, Kanu must demonstrate that:  (1) his trial
counsel had no reasonable basis for not calling these witnesses;
and (2) counsel's error was so egregious it effectively denied
Kanu a fair trial.  Strickland, 466 U.S. at 687-88; see also
Henderson v. DiGuglielmo, 138 F. App'x 463, 471 (3d Cir. 2005).
While counsel "has a duty to make reasonable investigations or
to make a reasonable decision that makes particular
investigations unnecessary," the decision of whether to call a
witness is an inherently strategic one.  Moore v. DiGuglielmo,
489 F. App'x 618, 625 (3d Cir. 2012) (quoting Strickland, 466
U.S. at 691.

Counsel is not required to call or to interview every
witness suggested to him by his client.  United States v.
Ciancaglini, 945 F. Supp. 813, 823 (E.D. Pa. 1996); United
States v. Jones, 785 F. Supp. 1181, 1183 (E.D. Pa. 1992).
Courts generally "will not second-guess tactical decisions of
counsel in deciding whether to call certain witnesses."  Gov't
of Virgin Islands v. Weatherwax, 77 F.3d 1425, 1434 (3d Cir.

-21-

1996) (citation omitted).  Thus, a decision not to use a certain witness does not constitute ineffective assistance of counsel if it "amounted to a tactical decision within the parameters of reasonable judgment." Duncan v. Morton, 256 F.3d 189, 201 (3d Cir. 2001).  Furthermore, even if counsel should have called a witness to testify, a petitioner must show prejudice, that is, a reasonable probability that the witness could have provided information that would have led to a different result at trial. Lewis v. Mazurkiewicz, 915 F.2d 106, 115 (3d Cir. 1990).

Kanu raised this claim before the Pennsylvania courts and thus the claim is properly before us.  He is only entitled to habeas relief in this court if the Pennsylvania Superior Court's decision was contrary to, or an unreasonable application of, clearly established federal law.  See Thomas, 581 F.3d at 124 (quoting 28 U.S.C. § 2254(d)).  The Superior Court applied the following standard to Kanu's claim:

> To establish that counsel was ineffective for failing to call a witness, Appellant must demonstrate that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

Commonwealth v. Washington, 927 A.2d 586, 599 (Pa. 2007).  The Superior Court concluded that counsel was not ineffective for

failing to call these three witnesses because the witnesses could have opened the door to the Commonwealth's expert regarding the culture of Sierra Leone.  As to Mohammed Koroma, the Superior Court also found that he was not available to testify for the defense.[1]

　　　　We conclude that Kanu can establish neither unreasonable attorney error nor prejudice as required to prevail on this claim.  The record reflects that trial counsel was reluctant to call these witnesses based on a fear that their testimony would open the door to the admission of testimony by the Commonwealth's expert regarding the culture of Sierra Leone. All three of these men are friends of Kanu and hail from Sierra Leone where, as noted above, there is no concept of rape as a crime, women are treated as chattel, and it is customary for a woman to marry her rapist.  As noted above, Conteh testified that he had never heard the concept of rape while living in Africa.  The victim also testified at trial that she told Mohammed Koroma about the rape but he merely laughed and said "what are you talking about rape, you are an African girl, you

---

1.  At the PCRA hearing, Mohammed Koroma testified that he was present for the entire trial but counsel never called him. However, the Superior Court credited counsel's testimony that he attempted to call Mohammed Koroma but Koroma failed to appear. Regardless, we find that there is not a reasonable probability that the outcome of trial would have been different if Mohammed Koroma had testified at trial.

shouldn't talk about rape, you know in Africa you don't talk about rape."  Given this background, the opinions of these witnesses regarding whether Kanu and Koroma were in a consensual romantic relationship and/or whether Kanu is a law-abiding person would likely have carried little weight with the jury.

The testimony of these witnesses also would have been cumulative of the other defense witnesses presented.  As noted above, Conteh testified as to the allegedly consensual nature of the relationship between Kanu and Koroma.  Through stipulation Kanu's friend Jalloh provided evidence of Kanu's good character.  Thus, there is no reasonable probability that the outcome of the trial would have been different had these three witnesses testified.  Accordingly, the Superior Court applied <u>Strickland</u> reasonably and we decline to grant habeas relief on this ground.[2]

VII

We adopt the Recommendation of Magistrate Judge Rice for the reasons set forth herein and will deny the motion of Kanu to vacate, set aside, or correct his sentence under 28 U.S.C. § 2254.  We determine that the motion and record of the action show conclusively that Kanu is not entitled to relief.

---

2.  Kanu points to the fact that the trial court granted relief on this claim and found that these witnesses were "critically important" to the defense.  However, we must defer to the Superior Court's ruling as the highest court in Pennsylvania to consider the issue.

As a result, we decline to hold an evidentiary hearing.  <u>Id.</u> §§ 2254(e) and (f); <u>see also</u>  <u>Campbell v. Vaughn</u>, 209 F.3d 280, 287 (3d Cir. 2000).

We will not issue a certificate of appealability since Kanu has not "made a substantial showing of the denial of a constitutional right."  <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483 (2000).